O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DAVID ENG, | CASE NO. CV 05-2686 ODW (SSx) |
| Plaintiff, | ORDER **GRANTING** CURTIS HAZELL'S MOTION FOR SUMMARY JUDGMENT AS TO FIRST AND THIRD CAUSES OF ACTION [179]; **DENYING** COOLEY, SOWDERS, AND LIVESAY'S MOTION FOR SUMMARY JUDGMENT AS TO REMAINING CLAIMS SET FORTH IN THE THIRD AMENDED COMPLAINT [200]; **GRANTING** LOS ANGELES COUNTY'S MOTION FOR SUMMARY JUDGMENT AS TO REMAINING CLAIMS SET FORTH IN THE THIRD AMENDED COMPLAINT [197] |
| vs. | |
| COUNTY OF LOS ANGELES, et al., | |
| Defendants. | |

## I.  INTRODUCTION

Currently before the Court are Defendants Curtis Hazell ("Hazell"), Steve Cooley ("Cooley"), Steven Sowders ("Sowders"), Curt Livesay ("Livesay")*,* and Los Angeles County's ("County") (collectively, "Defendants") various Motions for Summary Judgment ("MSJs"). (Dkt. #s 179, 197, 200.)  After careful consideration of the briefing and evidence submitted in support of and in opposition to each of these Motions, the record in this case, and the arguments offered by the parties at the August 23, 2010 hearing on these matters, the Court rules on each of Defendants' Motions as follows.

## II.  UNDISPUTED FACTS AND PROCEDURAL HISTORY [1]

Plaintiff David Eng ("Plaintiff" or "Eng") has been employed by the County as a Deputy District Attorney ("DDA") in the District Attorney's Office ("DAO") since July 1984, and has been a Level III DDA ("DDA III") since 1989.  The DAO is one of 37 County departments, and  since his swearing-in on December 4, 2000, has been headed by District Attorney ("DA") Cooley.  Hazell, a long-time friend of Cooley's,  has been a prosecutor in the DAO since 1976.  Livesay was employed by the DAO on and off between 1965 and 2006, and from 2000- May 2001 and 2002-2006, was Chief Deputy DA, reporting directly to Cooley.  Sowders, first employed by the DAO in 1973, served as Head Deputy of Employee Relations from 1993 to 2003, and reported directly to the Chief Deputy DA.  In April 2003, Sowders became Head Deputy of Central Trials, and then assumed his current position as Head Deputy of Auto Insurance Fraud.

At all times, Eng's employment has been governed by Civil Service Rules ("CSRs") adopted by the County's Board of Supervisors, and enforced by the Civil Service Commission ("CSC").  One of the purposes of the CSRs is to "assure all employees in the classified service of fair and impartial treatment at all times subject to Merit System Standards and appeal rights."[2]  Thus, the County exercises the "exclusive right to determine the mission of each of its departments . . . the assignment of work . . . . transfer and reassignment of employees . . . to promote or demote employees . . . to

---

[1] Unless otherwise noted, the following facts are culled from Defendants' Statements of Uncontroverted Fact and Conclusions of Law submitted in support of their three Motions for Summary Judgment.  Except where indicated, Plaintiff's Separate Statements of Genuine Issues in Opposition to Defendants' Motions were non-responsive or insufficient to create triable disputes.

[2] CSR 25.01(A) prohibits any type of employment discrimination based on "non-merit factors" "not substantially related to successful performance of the duties of the position."  CSR 15.01 states that assignment of "an employee from one position to another" within the same class and department "is a matter of departmental administration" subject to the limitations established by CSR 15.04.  CSR 15.04(A) states that "[a]n employee may appeal an assignment, interdepartmental transfer or change in classification to the Director of Personnel."  CSR 18.02 establishes an employee's procedural rights following discharge or demotion, including the right to a CSC hearing to determine whether the discharge or demotion is justified.

discipline and discharge employees, and to determine the methods, means and personnel by which the [C]ounty's operations are to be conducted."[3]

During his 2000 election campaign in which he defeated incumbent Gil Garcetti ("Garcetti"), Cooley suggested that there was a significant likelihood that fraud and environmental crimes had been committed in connection with the Los Angeles Unified School District's ("LAUSD") planning and construction of the Belmont Learning Complex ("Belmont Project"), and that a thorough investigation was required. Consequently, from early 2001 until April 2002, Eng was assigned to the Belmont Task Force ("Task Force") that Cooley established to carry out that investigation. The Task Force was originally organized as a separate entity within the DAO and headed by retired prosecutor Patchett, who repeatedly articulated his view that crimes had in fact been committed. Neither Livesay nor Sowders ever participated in the Task Force or attended its meetings. In August 2001, the Task Force was brought under the control of the DAO's Target Crimes Division, and Head Deputy of Target Crimes John Zajec ("Zajec") took over its supervision. Zajec reported to then Director of Specialized Prosecutions Hazell, who answered to Assistant DA of Special Operations Peter Bozanich ("Bozanich").

On July 16, 2001, the Task Force presented to Cooley and his Executive Staff its findings and recommendations regarding the filing of criminal charges. (Eng's 2007 Separate Statement of Genuine Issues Precluding Summary Judgment "2007SSGI" ¶ 50.) Against Pachett's wishes and recommendations, Plaintiff and his colleague, advised that no criminal charges associated with the project were warranted. (2007 SSGI ¶ 59, 60.) Plaintiff states that both Cooley and Hazell were "surprised" by the presentation, and that Hazell asked: "Damn, what's going on here?" (2007 SSGI ¶ 72.) Nevertheless, Cooley

---

[3] Plaintiff offers no support for his contention that the CSC "has no enforcement powers of a judgment it renders against a department." Even if the DAO's "continue[d] . . . refus[al] to comply with the order" to make Eng whole for his first suspension without pay were wrongful (a consideration negated by the CSC's subsequent upholding of Eng's second suspension without pay to run concurrently with the first), this says nothing about the CSC's enforcement powers. (See Dkt. # 251.) In any event, this contention is non-responsive to Defendants' statement of the "purpose" of the CSRs.

1  and the Executive Staff unanimously rejected Patchett's recommendation and concluded
2  that no criminal charges should be filed.  (2007 SSGI ¶ 73.)

3      At that meeting, the Task Force also discussed a newspaper article that reported that
4  the Certificates of Participation ("COPs") that the LAUSD had used to finance the
5  purchase of the Belmont property were being cancelled, and that the LAUSD would have
6  to refinance that amount at a much higher interest rate.  According to Plaintiff, the COPs
7  were cancelled because Patchett leaked to the Internal Revenue Service ("IRS") that the
8  LAUSD had used fraudulent COPs.  Plaintiff claimed, and purported communicated to
9  Cooley, that the COPs were legal and that reporting otherwise to the IRS was wrong and
10 should be rectified.  Cooley allegedly became angry and told Plaintiff to "shut up." (2007
11 SSGI ¶ 66.)

12      In Fall 2001, Eng began a romantic relationship with Task Force law clerk Adela
13 Ploscar ("Ploscar").  In December 2001, their relationship ended and Ploscar went to
14 Patchett and filed what was later deemed to be a false sexual harassment complaint against
15 Eng.[4]  Cooley learned of Ploscar's sexual harassment claim from Pachett, and instructed
16 Patchett that he had an affirmative duty to report the claim. After that, Cooley had no
17 further involvement in the matter.  On December 6, 2001, Zajec informed Eng that he was
18 under investigation (overseen by the DAO's Employee Relations Division)[5] for the sexual
19 harassment of Ploscar, and was to have no further contact with her.  Consequently, Eng
20 worked from home from that point until January 2002.

21      In April 2002, Zajec told Hazell that Eng's written analysis of environmental issues
22 was untimely and included portions lifted from a report prepared by Garcetti's

---

[4] Plaintiff maintains that the source of the complaint is disputed.  However, Plaintiff is collaterally estopped from claiming the allegations originated with anyone other than Ploscar. (See Dkt. # 251.)

[5] Consistent with the DAO's "discretion whether to investigate any purported breach of its policies" (2007 SSGI ¶ 103), the Employee Relations Division, headed at that time by Sowders, also oversaw investigations of Eng's alleged misconduct in response to incidents involving his ex-wife's neighbors, alleged access of the DAO's Prosecutor Information Management System ("PIMS") to obtain information about his ex-wife's boyfriend, and  threatening messages Eng left on his ex-wife's boyfriend's answering machine. Livesay, to whom Sowders reported at times, did not participate in any of the investigations, but Sowders did apprise him of their progress.

1  administration, and recommended that Eng's Task Force duties be reassigned.[6]  Hazell
2  communicated these concerns to Bozanich, who directed Hazell to find a new assignment
3  for Eng.  On April 1, 2002, pursuant to Hazell's determination that the DAO's Juvenile-
4  North Division branch office in Pomona "was in particular need of a DDA III prosecutor,"
5  Eng was notified of his reassignment.  While Eng did not experience any reduction in
6  compensation or benefits as a result of the reassignment, he contends that a reassignment
7  to any juvenile position after one's initial "stint" as a new DDA should be considered a
8  "clear demotion."  (See TAC ¶ 59; 2007 SSGI ¶ 189.)[7]

9      Given the DAO's policy of referring criminal matters involving DDAs to the
10 Attorney General's ("AG") Office as conflicts of interest,[8] the DAO referred issues arising
11 from Eng's access of the PIMS system  to the AG's Office on September 13, 2002.  The
12 referral indicated that, as of September 16, 2002, Eng would be placed on administrative
13 leave for the pendency of the matter, and that a decision regarding discipline was
14 "pending."  As a general rule, the DA is not involved in the disciplinary process.
15 However, he did "want[] to be advised" of serious matters, including AG referrals.  Thus,
16 Livesay, who "could not recall a single other criminal referral to the AG's [O]ffice for any
17 other employee who was ever caught using the DA[O]'s computer system for personal
18 reasons" (2007 SSGI ¶ 221), informed Cooley of the referral near the time it was made.
19 The AG's Office then filed a misdemeanor complaint against Eng for unlawful computer
20 access and receipt or possession of criminal records by an unauthorized person, but the

21

22  [6] Plaintiff's hearsay objection is overruled, as evidence of Zajec's statement is offered not to
23  prove that Eng's performance was deficient, but to explain Hazell's state of mind.  See Fed. R. Evid.
    801(c); United States v. Arteaga, 117 F.3d 388, 397-98 (9th Cir. 1997) (noting that statements offered
24  for their effect on the hearer or as circumstantial evidence of state of mind are not hearsay).

25  [7] Plaintiff's August 13, 2010 Request for Judicial Notice (Dkt. # 265) is granted over
    Defendants' objection, as all of the documents therein are already part of the file in this case.  However,
26  the Court wonders whether the multitude of materials submitted by Plaintiff undermines his cause.  For
    instance, the Court takes note of Plaintiff's failure to raise a triable issue of material fact in response to
27  Defendants' 2007 Undisputed Fact 28 (Exhibit B), stating that Plaintiff was not the only DDA III
    assigned to Pomona juvenile court, and that, based on DAO needs, approximately 13 DDA IIIs were
28  assigned to the nine County juvenile court offices from April 2002 - April 2003.  Plaintiff non-
    responsively disputed that the transfer was not in retaliation and that it was not a demotion.

    [8] Livesay testified that during his tenure as Chief Deputy DA, he could recall only five to ten
    referrals of DAO employees to the AG's Office for criminal claims.  (2007 SSGI ¶ 219.)

1  charges were dismissed on January 31, 2003 after the prosecution's primary witness
2  invoked his right against self-incrimination.

3       In response to the notification of administrative leave that Eng received from
4  Livesay,[9] Eng retained the services of lawyer Mark Garagos ("Garagos").  Following
5  Eng's receipt of a notice of the DAO's intent to suspend him, Geragos defended Eng at
6  a "Skelly Hearing" with Sowders and Assistant DA Sharon Matsumoto ("Matsumoto").
7  (2007 SSGI ¶¶ 200, 234-235.)  Thereafter, on December 5, 2002, the DAO suspended Eng
8  without pay ("first suspension") under CSR 18.01(A)[10] based on the then-pending criminal
9  complaint against him, effective December 1, 2002.  While the Notice of Suspension was
10 signed by Matsumoto, the letterhead also bore Livesay's and Cooley's names.  Eng
11 appealed this suspension to the CSC.  The Hearing Officer issued a Recommended
12 Decision on May 29, 2003 finding that the first suspension was, in fact, based on the filing
13 of criminal charges against Eng and that there was a nexus between the conduct alleged
14 in the complaint and Eng's DDA duties.  Despite the truth of those allegations, the
15 Hearing Officer also concluded that the decision to suspend Eng "without pay" was
16 inappropriate under the circumstances.  Accordingly, the Hearing Officer recommended
17 that Eng be made whole for all pay lost during his first suspension.  The CSC adopted the
18 Recommended Decision in full.

19      On February 28, 2003, the *Los Angeles Times* published an article (which Livesay
20 and Sowders read) airing Plaintiff's contention that he was suffering retaliation because
21 he had voiced his opinions relating to the Belmont Project, immediately after which
22 Cooley released the Task Force's report containing Eng's conclusions presented at the
23 July 16, 2001 meeting.  (2007 SSGI ¶¶ 245, 247, 252, 299, 300, 301.)  Sowders then told
24 Geragos, in Eng's presence, that Eng would never be allowed to return to work at the

---

26      [9] The notice that Livesay sent to Eng (through Geragos) included a statement of the DAO's
27 policy "that disciplinary matters are handled by the Chief Deputy [DA];" at that time, Livesay himself.

28      [10] CSR 18.01(A) states that most suspensions - including disciplinary suspensions - may not
exceed 30 days, but when the basis for the suspension is also the subject of a criminal complaint against
the employee, the suspension may continue until 30 days after the final decision in the criminal matter.
Eng's contention that Sowders' addition of an additional 30 days to his suspension was "mean[-]spirited
and . . . designed to force [him] out of the office" is non-responsive to Defendants' statement of the rule.

DAO because "they would come up with additional things to charge him with." (2007 SSGI ¶ 251.)[11] On April 2, 2003, Eng, Geragos, Sowders, and Livesay met to discuss a possible "settlement," which Eng did not accept. (2007 SSGI ¶¶ 298, 313.)

After dismissal of the criminal charges, the DAO reviewed the results of the earlier investigations to determine whether to discipline Eng. According to Livesay, although he had already settled on "pursuing disciplinary charges" against Eng prior to the article's publication, he did not determine the "extent" of the discipline until after the settlement meeting. (2007 SSGI ¶ 313.) Based on those earlier investigations,[12] the DAO again suspended Eng without pay for 30 days ("second suspension") on April 23, 2003, retroactive to December 1, 2002. Because the second suspension ran concurrently with the first, Eng did not miss any additional work. The second suspension notice alleged that Eng violated DAO regulations by: (1) making certain statements to Sheriffs Deputies responding to his ex-wife's calls about her neighbors; (2) dealing with individuals involved in an altercation between his ex-wife and her neighbors untruthfully; (3) accessing the PIMS system; (4) leaving threatening messages on his ex-wife's boyfriend's answering machine; and (5) failing to exercise sound judgment in his relationship with Ploscar. Eng appealed this second suspension, after a four day hearing on which the Hearing Officer recommended the denial of Eng's appeal, calling the suspension "appropriate."

---

[11] Defendants' hearsay objection is overruled, as the statement is not offered for its truth, but rather to demonstrate Sowders' state of mind as related to Eng.

[12] Plaintiff does not dispute that the DAO relied on the results of the earlier investigations in imposing the second suspension, or that the DAO contemplated discipline on the grounds investigated before the referral of the criminal matter to the AG's Office (2007 SSGI ¶¶ 201-204), but does contend that Sowders' investigations were not concluded at the time that the referral was made. Instead, he claims that Sowders continued to investigate him well into 2003. (Eng Decl. in Opp'n to Cooley, et al. MSJ ¶ 5.) Eng cites the questioning of his ex-wife and children's teachers as examples of ongoing surveillance, as well as his encounter with investigators inquiring as to why he was not answering his office telephone upon his return from his mother's funeral in Washington in September of that year. Plaintiff concedes, however, that as far as Livesay knew, all the investigations into Eng had concluded as of September 20, 2002. (2007 SSGI ¶¶ 201, 203.) While there seems to be no dispute that the investigation into Eng was "extraordinary" and "one of the longest in the [DAO's] history," the CSC later found the delay between the investigation and the imposition of discipline non-prejudicial. (2007 SSGI ¶ 114.)

The Hearing Officer found that Eng violated the DAO's rules in three of the five alleged respects – dealing with individuals involved in an altercation between his ex-wife and her neighbors untruthfully, accessing the PIMS system, and leaving threatening messages on his ex-wife's boyfriend's answering machine – and concluded that these actions "brought discredit, embarrassment and loss of confidence in the office and [were] a conflict of interest."    The Hearing Officer found no violations based on Eng's statements to Sheriff's Deputies or his relationship with Ploscar, but noted that it had been Ploscar who had "fil[ed] a false claim for sexual harassment."

The Hearing Officer rejected Eng's "defenses" that the charges were "untimely and . . . part of an attempt to get rid of him," and noted both that Eng "introduced no evidence that the [DAO's] discipline was based on personal animus" and that "it appear[ed] that the [DAO] had a legitimate concern that Eng was . . . bringing discredit on the [DAO]." The Hearing Officer also concluded that "[t]he decision to suspend Eng for 30 days was appropriate," described Eng's violations as "quite serious," and stated that either "Eng's suggestion that he would suborn perjury" or the "egregious" messages he left "could, [alone], support a 30 day suspension."  The Hearing Officer agreed that the DAO needed "to send Eng a message," and added that "Eng has offered little in the way of mitigating circumstances . . . has portrayed himself as a victim of wrongdoing by others . . . even by the [DAO] . . . [and] has failed to take any responsibility for his own conduct and the fact that his responses were wholly inappropriate."[13]  The CSC again adopted the Hearing Officer's Decision in full.  (See Dkt. # 251.)

All told, Eng's time away from work lasted from September 16, 2002 to April 11, 2003.  Sowders told Eng that he would have suspended him earlier but for his "sensitive" Task Force work.  (Eng Decl. in Opp'n to Cooley, et al. MSJ ¶ 3.)[14]  By that time, his

---

[13] Eng may not challenge any of the Hearing Officer's findings or contending that the second suspension was based on "personal animus" or retaliatory motives.  (See Dkt. # 251.)

[14] Eng contends that this creates a material dispute as to Sowders' knowledge of his Task Force meeting comments prior to the publication of the *Los Angeles Times* article.  Defendants' hearsay objection is overruled, as it is not offered to prove that Sowders really would have suspended Eng earlier, but rather to illustrate Sowder's knowledge of Task Force business.  *See* Fed. R. Evid. 801(c).

position in Pomona had been reassigned to another DDA III.  Therefore, on April 14, 2003, upon his return to work and just prior to receiving a second Notice of Intent to Suspend, Eng was assigned to the Los Padrinos Juvenile Court ("Los Padrinos") in Downey, and on May 15, 2008, to the David V. Kenyon Juvenile Justice Center ("Kenyon") in Los Angeles, where he remains today.  Both of these re-assignments were made within Hazell's chain of command, but were primarily attributable to the Head Deputies at each facility, and based on the staffing needs of, the Juvenile-South and/or -North Divisions.[15]  Eng did not appeal his 2002, 2003, or 2008 transfers to the CSC or Director of Personnel.  While Defendants maintain that Eng experienced no adverse consequences as a result of these two later transfers, as both Los Padrinos and Kenyon are geographically closer to Plaintiff's home, Plaintiff contends that the transfers subjected him to heavier traffic and left him in a position unamenable to promotion.  (Eng Decl. in Opp'n to County MSJ ¶ 4.)

Plaintiff filed a state court lawsuit on March 29, 2004, which he then dismissed on October 4, 2004 to pursue his claims in federal court.  On April 12, 2005, Plaintiff filed the instant federal action alleging violations of 42 U.S.C. section 1983 and California Labor Code section 1102.5, and intentional infliction of emotional distress.  This was the first Complaint in which Plaintiff purported to sue the County or Hazell under section 1983 or attempted to recover under a theory of municipal liability.

In 2005, Eng, along with 320 other candidates, applied for a promotion to DDA IV, and completed an examination consisting of (1) an Appraisal of Promotability ("AP") by a Review Committee (of which Livesay was the head and Hazell was a part) and (2) an objective, electronically graded written examination.  Under CSR 11.01(C),[16] only those candidates whose overall score was 94.5 or higher on a scale of 100 were placed in "Band

[15] The material to which Plaintiff refers the Court to dispute this fact is unrelated to the 2003 and 2008 transfers, and therefore non-responsive.

[16] Civil Service Rule 11.01 provides that "[i]n filling vacancies . . . the appointing authority shall make appointment from eligible lists certified by the director of personnel," that "[t]he director of personnel shall assemble candidates into groups based on their weighted total score in the examination," and that "passing candidates shall be assembled into separate groups having fixed ranges as follows: Group 1 95%--100%, Group 2 89%--94%, Group 3 83%--88%. . . ."

1” and were eligible for promotion.   Under CSR 11.01(E),[17] candidates outside Band 1 were ineligible for promotion unless and until all but four candidates within Band 1 were promoted.  Eng's written score was 86.67 and his original AP score was 90, placing him in Band 3.  Given Eng's written score, he would not have been placed in Band 1 even if his AP score had been a perfect 100.   Because 94 candidates in Band 1 were left un-promoted when the list expired, Eng's written examination score made it mathematically impossible for the 2005 exam to render him eligible for promotion to DDA IV. Consistent with his rights under the CSRs, Eng appealed his AP score (but not his written score) to the Director of Personnel.  On January 19, 2006, the Director of Personnel lowered Eng's AP score from 90 to 85 due to a prior miscalculation, (maintaining his Band 3 placement), and notified him of his right to file an appeal with the CSC within 10 days.  Eng requested a CSC hearing, which was denied on August 9, 2006 "based on the Commission's opinion that the Appellant [was] not likely to prevail."

On June 9, 2008, the DAO circulated a memo instructing Grade III or IV DDAs interested in a job in the Environmental Law Section to contact Assistant Head Deputy Stanley Williams ("Williams").  Plaintiff promptly requested an interview, after which Williams told Plaintiff that he would submit Plaintiff's name for consideration.  On August 20, 2008, Plaintiff inquired as to the status of his application and was told that another applicant had been selected for the position. (Eng Decl. in Opp'n to County MSJ ¶¶ 12-14, 16.)  No Defendant or final County policymaker was involved in interviewing, considering, or selecting candidates for this opening.[18]  Rather, the decision to eliminate Eng from consideration was made by Bureau of Fraud and Corruption Prosecutions Director Janice Maurizi ("Maurizi") after consultation with non-Defendant Bureau Directors, all of whose offices are, like Defendants', located on the "18th floor."

---

[17] Civil Service Rule 11.01(E) provides that "[a]ll appointments to positions in the classified service shall be made from the highest ranking group on such lists, except that when the highest ranking group does not include at least five persons who are available for appointment, the appointment may be made from the next highest group or groups to include at least five persons."

[18] Plaintiff contends Defendants must be responsible for the DAO's failure to promote him to the Environmental Law Section.  (TAC ¶ 102; Eng Decl. in Opp'n to County MSJ ¶17, claiming Williams told Eng that the decision was made by "the 18th floor," on which Defendants' offices are located.)

Meanwhile, Plaintiff filed First and Second Amended Complaints on January 23, 2006 and July 5, 2006 respectively. (Dkt. #s 20, 36.)  On July 11, 2007, the Court denied Defendants' first Motion for Summary Judgment, which the Ninth Circuit affirmed on April 7, 2009.  (Dkt. # 96, 122.)   Following the Court's reconsideration and reversal of the June 14, 2006 dismissal of Plaintiff's section 1983 claim, Plaintiff filed a Third Amended Complaint on June 4, 2009 asserting the same claims as those in his original federal pleading.  (Dkt. # 133.)  On July 14, 2009, the Court stayed proceedings pending resolution of Defendants' Petition for Writ of Certiorari to the United States Supreme Court on the issue of qualified immunity.  (Dkt. # 144.)

On January 11, 2010, the Supreme Court denied Defendants' Petition, after which the stay of this case was lifted, and Defendants filed a renewed Motion to Dismiss Plaintiff's claims for violation of California Labor Code section 1102.5 and intentional infliction of emotional distress.  (Dkt. # 166; 169.)  The Court granted Defendants' Motion in part, dismissing the section 1102.5 claim.  (Dkt. # 196.)  On June 14, 2010, the Court granted in part Defendants' Motion for Partial Summary Judgment Based on Preclusive Effect of Civil Service Commission Decisions, finding that Plaintiff is collaterally estopped from revisiting the CSC's findings that *Ploscar* filed the false sexual harassment claim, that the second suspension was *not* based on "personal animus" or retaliatory motives, or that the first suspension was "baseless," and from claiming that the County's failure to promote him in 2005 was due to an ongoing retaliatory scheme rather than his written exam score.  (Dkt. # 251.)  The Order also noted that Defendants cannot escape the CSC's finding that its handling of Plaintiff's first suspension was "not appropriate under the circumstances" of Plaintiff's case at that time.  (Dkt. # 251.)

### III.  LEGAL STANDARD

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997). Evidence that court may consider includes the pleadings, discovery and disclosure materials, and any affidavits on file. Fed. R. Civ. P. 56(c)(2).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 323-24 (1986). That burden may be met by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. Once the moving party has met its initial burden, the nonmoving party must reach beyond the pleadings and identify specific facts that show a triable issue. *Id*. at 323-34; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). Summary judgment is appropriate if a party, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp v. Catrett*, 477 U.S. at 322.

Only genuine disputes over facts that might affect the outcome of the suit will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Aprin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (noting that the nonmoving party must present specific evidence from which a reasonable jury could return a verdict in its favor). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). Further, it is not the task of the district court "to scour the record in search of a genuine issue of triable fact. [Courts] rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

# IV.  DISCUSSION

A five part test is used to evaluate First Amendment retaliation claims against government employers under section 1983.  The Plaintiff bears the initial burden to show "(1) that he or she engaged in protected speech." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (citations omitted). The plaintiff may prove that speech was "protected" by showing that "the speech addressed an issue of public concern," and "was spoken in the capacity of a private citizen and not a public employee." *Eng v. Cooley*, 552 F.3d 1062, 1070-71 (9th Cir. 2009) (citations omitted).  "Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Id.* at 1071 (citations and quotations omitted).

Plaintiff's Third Amended Complaint listed three instances of speech to which he attributed Defendants' alleged retaliatory conduct: his recommendation that no criminal charges should be filed in relation to the Belmont Project and his statements regarding the COPs at the July 16, 2001 Task Force meeting, as well as his lawyer's claim that he was the victim of retaliation printed in the *Los Angeles Times* on February 28, 2003. However, this Court, and the Ninth Circuit, have already determined that only Plaintiff's statements relating to the legality of the COPs and Geragos' statements to the press constitute covered speech sufficient to satisfy this first portion of Plaintiff's section 1983 burden. *Eng v. Cooley*, 552 F.3d 1062, 1072-73 (9th Cir. 2009).

After identifying protected speech, a plaintiff must show " that the employer took 'adverse employment action'[] and that [the] speech was a 'substantial or motivating' factor for the adverse employment action." *Coszalter v. City of Salem*, 320 F.3d at 973 (citations omitted).  In proving that he or she was subjected to "adverse employment action," the plaintiff must simply show that "a reasonable employee would have found the challenged action *materially* adverse, which in this context means it well might have dissuaded a reasonable worker" from exercising his or her First Amendment rights. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations and

1  quotations omitted) (emphasis added).  This is not to say, however, that the plaintiff need
2  show that the act of alleged retaliation was "severe" or "of a certain kind."  *Coszalter v.*
3  *City of Salem*, 320 F.3d at 975.  "Nor does it matter whether an act of retaliation is in the
4  form of the removal of a benefit or the imposition of a burden."  *Id*. (recounting various
5  employer acts deemed sufficiently adverse to support a section 1983 claim, including (1)
6  reassignment to another position, (2) investigation and filing of an adverse employment
7  report, and (3) temporary suspension).  Instead, the plaintiff need only establish "that the
8  actions taken by the defendants were 'reasonably likely to deter [him or her] from
9  engaging in protected activity [under the] future.'"

10  To show that the protected speech was a "substantial or motivating factor" for the
11  government employer's "adverse employment action," "very little" *direct* evidence is
12  required.  *Ulrich v. City and County of San Francisco*, 308 F.3d at 980 (citations
13  omitted).  Rather, "a plaintiff can show that retaliation [for  free speech rights known to
14  have been exercised] was a substantial or motivating factor behind a defendant's adverse
15  employment actions" by introducing evidence (1) of the "proximity in time between the
16  protected action and the allegedly retaliatory employment decision," from which a "jury
17  logically could infer [that the plaintiff] was terminated in retaliation for his speech;" (2)
18  of the employer's expression of "opposition to [the] speech, either to [the employee] or
19  others; or (3) that the "employer's proffered explanations for the adverse employment
20  action were false and pre-textual."  *Keyser v. Sacramento City Unified Sch. Dist*., 265
21  F.3d 741, 751-52 (9th Cir. 2001) (as amended) (citation omitted).

22  "Upon these showings, the burden shifts to the public employer to demonstrate
23  either that . . . its legitimate administrative interests outweighed [the plaintiff's] First
24  Amendment rights or that . . . it would have reached the same decision even in the
25  absence of the plaintiff's protected conduct."  *Nichols v. Dancer*, 567 F.3d 423, 426 (9th
26  Cir. 2009) (citations omitted); *Ulrich v. City and County of San Francisco*, 308 F.3d 968,
27  976-77 (9th Cir. 2002) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)
28  (establishing balancing test); *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287

1   (1977) (establishing mixed-motive analysis).  "[T]he *Pickering* balancing test[] asks

2   'whether the . . . government entity had an adequate justification for treating the

3   employee differently from any other member of the general public.'" *Eng v. Cooley*, 552

4   F.3d at 1071 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  The *Mt. Healthy*

5   mixed-motive analysis provides that the government may "avoid liability by showing that

6   the employee's protected speech was not a but-for cause of the adverse employment

7   action" and that it "would have reached the same decision even in the absence of the

8   [employee's] protected conduct . . . if [a] proper reason alone had existed."  *Eng v.*

9   *Cooley*, 552 F.3d at 1072 (citations and quotations omitted).  *See also Allen v. Iranon*,

10  283 F.3d 1070, 1078 (9th Cir. 2002) (citing *Gillette v. Delmore*, 886 F.2d 1194, 1198 (9th

11  Cir.1989)) (holding that a defendant must demonstrate that it *would* have taken the

12  adverse action absent the protected speech, and not simply that it justifiably *could* have).

13       A.   CURTIS HAZELL'S MOTION FOR SUMMARY JUDGMENT[19]

14       Defendants' move for summary judgment on the entirety of Plaintiff's claims

15  against Hazell on the basis that Plaintiff cannot produce sufficient evidence to prove that

16  Hazell took any materially adverse employment action against him within the limitations

17  period.  (Hazell MSJ at 6-10.)  In response, Plaintiff simply postulates that Hazell "must

18  have" known about the DAO's alleged "efforts to strong-arm [him]," and therefore

19  concludes that  "Hazell had a direct hand in most of the adverse employment actions

20  taken against [him]."  (Opp'n to Hazell MSJ at 17, 19.)

21       1.   *Materially Adverse Employment Actions Attributable to Hazell*

22       Throughout the course of this case, Plaintiff has discussed a number of

23  employment actions which he claims were materially adverse, including: (1) the claim

24  and investigation of alleged sexual harassment of Ploscar, (2) the transfer to Pomona in

25  April 2002, (3) the investigations into the subjects of the first and second suspensions,

26  (4) the administrative leave, (5) the referral of the PIMS matter to the AG's Office

27

28       ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
       [19] After close analysis of Defendants' 2007 Motion for Summary Judgment and Hazell's current
       Motion, the Court concludes that, while Defendants request reconsideration of a number of issues
       already presented and considered, those questions herein discussed were either not raised at all by the
       2007 Motion, or are required for the proper consideration those novel questions.

leading to the filing of misdemeanor charges, (6) the first suspension without pay, (7) the alleged refusal to restore the pay withheld during his first  suspension, (8) the second suspension without pay, (9) the suspected reduction of his insurance benefits, (10) the transfer to Los Padrinos in 2005, (11) the failure to promote him to DDA IV in 2005 due to his allegedly artificially deflated AP score, (12) the transfer to Kenyon in 2008, and (13) the failure to promote him to the Environmental Law Section in 2008.

While this is an impressive list of harms, there is only marginal linkage of Hazell to the three transfers (to Pomona, Los Padrinos, and Kenyon), the figuring of Plaintiff's AP score, and the failure to promote him to the Environmental Law Section.  In response to Defendants' statement of the limited range of Plaintiff's allegations (Hazell MSJ at 1, 4, 10), Plaintiff fails to direct the Court to any admissible evidence that even *mentions* Hazell, let alone proves his involvement in any of the other questioned actions.  He only vaguely opines that Hazell "must have" had a role in the rest of the actions on the list, and attempts to convince the Court, without citation to any evidence, that it is simply "not believable" that he did not.  (Eng Decl. in Opp'n to Hazell MSJ ¶ 17.)  His conclusory speculation as to Hazell's participation in the investigations, prosecutions, and suspensions are, however, insufficient to withstand summary judgment.  *See Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1110-11 (9th Cir. 2006).

In regards to the AP score,  Defendants presented irrefutable evidence that Plaintiff was not promoted to a DDA IV position in 2005 because his objective written score rendered him ineligible, and that, even had Hazell and the rest of the AP committee scored him at a perfect 100, Plaintiff still could not have been promoted. Notwithstanding the fact that Plaintiff is collaterally estopped from litigating the question of whether his final score on the DDA IV examination reflected any retaliatory motives (Dkt. #251), Plaintiff fails to address or even recognize  the strength of Defendants' evidence to the contrary.  Therefore, Plaintiff not only does not, but indeed cannot create a triable issue of material fact as to whether any of the Defendants' actions, including Hazell's,  might have contributed to the score he received on the 2005 DDA IV examination, and his resulting ineligibility for promotion at that time.

Similarly, Plaintiff fails to direct the Court to any admissible evidence in support of his claim that Hazell participated in the decision not to promote him to the Environmental Law Section. Defendants offer the Maurizi Declaration indicating that Maurizi herself eliminated Plaintiff from consideration after conferring with a number of individuals, none of whom are named Defendants. Plaintiff, for his part, offers Williams' statement that the decision was made by the "18th floor;" a statement subject to two fatal flaws. First, the statement constitutes inadmissible hearsay not subject to any exception. *See* Fed. R. Evid. 801-803. Second, not only does Plaintiff fail to reach beyond the allegations already previewed in the Third Amended Complaint, but he offers no evidence to attribute the decision to any particular individuals on the 18th floor over others. This deficiency is particularly glaring given that the Maurizi Declaration establishes that the non-Defendant individuals with whom she conferred also maintained 18th floor offices. Plaintiff thus fails to present sufficient evidence to rebut Defendants' evidence such that a reasonable jury could conclude that any Defendant, Hazell or otherwise, influenced or participated in the 2008 decision not to promote him to the Environmental Law Section.

As for three transfers between the different juvenile offices, Defendants concede for the purposes of Hazell's Motion that Hazell's transfer of Eng off the Task Force and into the Juvenile-North Division office in Pomona constituted a materially adverse employment action. Notwithstanding Defendants' failure to specifically contend otherwise, the Court would in any case be apt to find a material fact in dispute as to the materiality of the transfer. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. at 70-71 (citations and quotations omitted) (explaining that, despite the fact that "both the former and present duties [may] fall within the same job description," all the surrounding circumstances must be "judged . . . from the perspective of a reasonable person in the plaintiff's position" to determine whether a reassignment of duties may be considered materially adverse.) According to the *Burlington Northern* Court, "[a]lmost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee . . . from

[exercising his or her rights] would be to insist that [he or] she spend more time" filling those positions "objectively considered" less desirable. *Id.* Despite the fact that Eng's pay grade was not reduced as a result of his transfer to Pomona (that is, he remained a DDA III), and that he was by no means the only DDA III assigned to a juvenile office, Eng's consideration of the transfer to be a "clear demotion" carries some weight.

However, relying on *Burlington Northern*, Defendants argue that the transfers to Los Padrinos and Kenyon did not constitute materially adverse employment actions because Plaintiff suffered no detriment *above* that which he already had as a result of the transfer to Pomona.[20] (Hazell MSJ at 9, 13; Reply at 6.)  Rather than dispute this point, Plaintiff concentrates on arguing that the transfer to Pomona was not only materially adverse, as already conceded, but substantially motivated by retaliation.[21]  (Opp'n to Hazell MSJ at 20-23.)  Because Plaintiff failed to present any evidence of the material adversity of the second and third transfers in response to Defendants' challenge, he fails to create a triable issue of material fact such that they may support his allegations of retaliation.  Plaintiff is therefore left to rely exclusively on the transfer to Pomona in April 2002 as the basis of his section 1983 claim against Hazell.

### 2.   *Application of Statute of Limitations*

"[C]laims brought under [section] 1983 borrow the forum state's statute of limitations for personal injury claims." *Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1026 (9th Cir. 2007); s*ee also Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004).  Effective January 1, 2003, the statute of limitations for personal injury actions in California was raised from one year to two. *Jones v. Blanas*, 393 F.3d at 927 (citations omitted). *See also Canatella v. Van De Kamp*, 486 F.3d 1128, 1132-33 (9th Cir.2007) (applying California's former one-year personal injury statute of limitations to section 1983 claims that were more than one-year old as of January 1,

---

[20] Defendants note that both Los Padrinos and Kenyon are locations geographically closer to Plaintiff's home in San Marino than was Pomona.  In response, Plaintiff complains of heavier traffic congestion, but offers no evidence by which any jury could conclude that, balancing the reduced mileage with the heavier traffic, his actual commute time was increased.

[21] Plaintiff also failed to address Defendants' showing that Hazell "had an adequate justification" for the transfers, and that he would have done so despite Plaintiff's speech.  (Hazell MSJ at 12-13.)

2003.)  "A claim accrues when the plaintiff knows, or should know, of the injury which is the basis of the cause of action." *Fink v. Shedler*, 192 F.3d 911, 914 (9th Cir. 1999).

Because the only materially adverse action attributable to Hazell occurred more than three years before Plaintiff purported to sue him under section 1983, Defendants' contention that Plaintiff's section 1983 claim against Hazell is time-barred is well-taken. (See Hazell MSJ at 1, 7.)  There is no dispute that when Plaintiff filed his original state court complaint on March 29, 2004, he named Hazell as a Defendant.  However, Plaintiff did not include Hazell in the enumerated list of defendants he sought to hold responsible for any alleged section 1983 violation.  When Plaintiff voluntarily dismissed that matter on October 4, 2004 to pursue his claims in federal court, the complaint had not been amended to allege Hazell's liability under section 1983.  Rather, Plaintiff sued Hazell under section 1983 for the first time upon the filing of his federal lawsuit on April 12, 2005.  This was more than three years after Hazell informed Plaintiff of his reassignment to Pomona, and well outside the two year statute of limitations applicable to an action taken on April 1, 2002.  *See Jones v. Blanas*, 393 F.3d at 927.  In response, Plaintiff relies on two equally unavailing theories (1) the continuing violation doctrine, and (2) "relation back."  (Opp'n to Hazell MSJ at 24-25.)

Plaintiff's reference to the continuing violation doctrine, whether or not applicable to actions taken by the other Defendants, does not apply to Hazell.[22]  The continuing violations doctrine provides "an equitable exception to the timely filing requirement." *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 63-64 (2000) (citation omitted). Under this doctrine, "a systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period." *Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir. 1982).  *See also DeGrassi v. City of Glendora*, 207 F.3d 636, 644 (9th Cir. 2000) (applying doctrine to claim under

---

[22] The Court is mindful of the Ninth Circuit's note regarding the potential propriety of the application of the continuing violation doctrine in this matter.  *Eng v. Cooley*, 552 F.3d at 1073 n.4. However, the Ninth Circuit's note was included while "assuming that Eng's version of the material facts [was] correct," a situation which Eng has, at least as it related to Hazell, failed to recreate.  *Id.* at 1064.

42 U.S.C. § 1983); *Green v. Los Angeles County Superintendent of Sch.*, 883 F.2d 1472, 1480 (9th Cir. 1989) (same).

However, discrete "acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). *See also Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003) (applying *Nat'l R.R. Passenger Corp. v. Morgan* to hold that time-barred acts could not be used to support section 1983 free speech retaliation claims). Under federal law, a retaliatory act is considered a discrete act that occurs at a particular time, and the fact that some "acts ... fall within the statutory time period" does "not make timely acts that fall outside the time period." *Id*. at 110, 112 (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)). Indeed, the *National Railroad* Court refused to uphold application of the continuing violation doctrine to "serial violations" that were "plausibly or sufficiently related" to other acts for which suit had been timely brought. *Id*. at 114. The Court explained that "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are [easily identified] . . . retaliatory adverse employment decision[s] constitut[ing] separate actionable" incidents for which charges must be filed "within the appropriate time period." *Id*. at 114.

"Hostile environment claims are different in kind from discrete acts," as "[t]heir very nature involves repeated conduct" rather than an action that "can[] be said to occur on any particular day." *Id*. at 115 (differentiating a hostile work environment on the basis that a "single act . . . may not be actionable on its own"). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Id*. at 117 (citation and quotations omitted). While Eng now attempts to argue that Defendants' "conduct against [him] was a series of separate [retaliatory] acts that collectively constitute one unlawful . . . practice" (Opp'n to Hazell MSJ at 24), the nature of Plaintiff's allegations, at least against Hazell, is more consistent with a discrete acts analysis. Indeed, the only actionable conduct attributable to Hazell

is the 2002 transfer to Pomona, which, consistent with *National Railroad's* explanation, most closely resembles a discrete act.

Even assuming for a moment that transfers did not constitute discrete acts such that Eng's subsequent transfers to Los Padrinos and Kenyon could be linked to the transfer to Pomona to establish "a series of separate acts," and that Plaintiff had adequately raised a disputed issue of fact as to the materiality of the later two transfers, Plaintiff would not be able to overcome the time-barred fate of a claim based on the first transfer. Consistent with the holding in the case upon he himself relies, Plaintiff cannot cite the continuing "effects" of a prior wrongful act to "give [it] present effect." *Del. State Coll. v. Ricks*, 449 U.S. 250, 257-58 (1980) (citation omitted) (holding that "mere continuity of employment . . . is insufficient to prolong the life of a cause of action"). Because Plaintiff was already subject to the objectionable stigma attached to a protracted "stint" in a juvenile position as a result of the transfer to Pomona, any similarly stigmatizing effects experienced as a result of the other two transfers would simply constitute a continuation of that which he suffered already. The continuing violation doctrine may therefore not appropriately be applied to give continuing effect to Eng's section 1983 claim against Hazell, and is therefore ineffective in curing his failure to sue Hazell under section 1983 within the applicable statute of limitations.

Plaintiff's alternative argument that his first federal Complaint "relates back" to his state lawsuit is similarly unhelpful. Generally, "an *amendment* of a pleading relates back to the date of the original pleading when . . . the claim . . . asserted in the *amended* pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the *original* pleading." Fed. R. Civ. P. 15(c)(2) (emphasis added). *See also* 1966 and 1991 Advisory Committee Notes (explaining that the relation back rule was intended to remedy prior misconceptions that amendment of a pleading to correct the misnomer or misdescription of a defendant in an existing action "would amount to the commencement of a new proceeding"). Yet, the "relation back" reasoning does not apply with equal force to actions that are, in actuality, entirely new or separate proceedings. *O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1111 (9th Cir. 2006) (citing Fed. R. Civ. P.

15(c)(2)) (holding that the plaintiff's second complaint did not relate back to her first complaint because her second complaint was not an *amendment* to her first complaint, but rather a *separate* filing).

Here, Plaintiff attempts to relate the Complaint he filed to initiate his federal lawsuit in April 2005 back to his March 2004 initiating pleadings in state court. (Opp'n to Hazell MSJ at 24-25.)  Yet, the Federal Rules simply cannot be read to permit Plaintiff to do this.  Plaintiff made a conscious decision not to ascribe section 1983 liability to Hazell in his original action, the pleadings for which essentially ceased to operate upon his strategic decision to dismiss that matter in favor of a filing a "new" action in federal court.  Thus, there were no pleadings to amend when Plaintiff filed his federal action, and consequently, no allegations to which any amended pleadings might have related back.  Because Plaintiff failed to provide evidence sufficient to create a triable issue of material fact as to any retaliatory actions taken by Hazell within the limitations period, Hazell is entitled to judgment as a matter of law on Plaintiff's section 1983 claim.

3.    *Plaintiff's Intentional Infliction of Emotional Distress Claim*

Relying on *Miklosy v. Regents of Univ. of Cal.*, 188 P.3d at 629 (Cal. 2008), Defendants' also seek the summary adjudication of Plaintiff's claim against Hazell for intentional infliction of emotional distress.  According to *Miklosy*, "[t]o the extent [a] plaintiff purports to allege any distinct cause of action [like intentional infliction of emotional distress], not dependent upon the violation of an express statute or violation of fundamental public policy, but rather directed at the intentional, malicious aspects of [a] defendant['s] conduct," workers' compensation law bars the claim.  *Id*. at 645.  Operating under the assumption that Plaintiff's section 1983 claim against Hazell was valid, as this Court was required to do while examining Defendants' final Motion to Dismiss (Dkt. # 169), the Court found that Plaintiff's intentional infliction of emotional distress claim was dependent on that section 1983 violation, and rejected Defendants' argument in favor of its dismissal. However, because Defendants are now entitled to judgment as a matter of law on Plaintiff's section 1983 claim against Hazell, Plaintiff's intentional infliction of emotional distress claim against Hazell constitutes nothing more

than a claim "directed at the intentional, malicious aspects of [Hazell's] conduct," and is therefore barred by workers' compensation law.  Accordingly, Defendants are entitled to the summary adjudication of this particular claim against Hazell as well.

Because Plaintiff failed to raised triable issues of fact as to Hazell's involvement in any materially adverse employment actions taken against Eng within the limitations period such that he could maintain a section 1983 claim (and consequently, a claim for intentional infliction of emotional distress) against Hazell, Defendants' Motion for Summary Judgement as to all remaining claims against Hazell is hereby GRANTED.

B.   COOLEY, SOWDERS, AND LIVESAY'S MOTION FOR SUMMARY JUDGMENT

Defendants also seek summary adjudication of all of Eng's claims against Cooley, Sowders, and Livesay for all of the allegedly retaliatory acts he attributes to them. Specifically, Defendants contend Eng failed to produce *any* evidence showing that Cooley subjected him to *any* adverse action, and that Sowders and Livesay had no retaliatory motive for the actions they did take.  The Court examines each point in turn.

1.   *Material Questions of Fact as to Coooley's Responsibility*

Defendants argue that Plaintiff cannot meet the second element of a *prima facie* retaliation claim as it relates to Cooley, as there is no evidence that Cooley *personally* subjected Eng to any "adverse employment action."  (Cooley, et al. MSJ at 7, quoting *Nichols v. Dancer*, 567 F.3d at 426.)  Plaintiff basically concedes this point, but argues that such evidence is not necessary for the purposes of his claims against Cooley because "personal participation is not the only predicate for section 1983 liability."  (Opp'n to Cooley, et al. MSJ at 17-18, quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).)

At the heart of Plaintiff's retaliation claim lies the mandate that "every person who, under color of [law] . . . , subjects, or *causes to be subjected*, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983 (emphasis added).  One "subjects another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participate's in another's affirmative acts, or omits to perform an act which he is legally required to do that causes

the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d at 743 (citation omitted).  "Moreover . . . anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable." *Id*.  Thus, "[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."  *Id*. (citation omitted).  *See also Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991) (citations and quotations omitted) (holding that a supervisor with no personal involvement may be liable for the constitutional violation of a subordinate for "culpable action or inaction in the training, supervision, or control of his subordinates," "acquiescence in the constitutional deprivation[]," or "reckless or callous indifference to the rights of others"); *Redman v. County of San Diego*, 942 F.2d 1435, 1446-47 (9th Cir. 1991) (citations and quotations omitted) (explaining that a supervisor may be liable for a section 1983 violation if he or she (1) is personally involved in the constitutional deprivation, or (2) implements a policy that "itself is a repudiation of constitutional rights and is the moving force of the constitutional violation").

Here, Plaintiff claims that Cooley should be held liable for the actions of his subordinates because, even assuming that he had no personal hand in any of the actions of which Eng complains, he acquiesced in their wrongdoing such that they were able to continue.  Plaintiff provides as evidence of Cooley's hostility towards him Cooley's order to "shut up" when Plaintiff commented on the legality of the COP's during the July 16, 2001 Task Force meeting, and indisputably noted that Cooley "wanted to be informed" of serious matters within the DAO.[23]  Drawing all reasonable inferences in favor of Plaintiff, the Court is not convinced that a reasonable jury would be unable to conclude that Cooley was unaware of the numerous allegedly unconstitutional suspensions and

[23] Plaintiff also attempts to support this argument by claiming that a topic of discussion at meetings attended by Cooley, Livesay, and Sowders was "how to get rid of Eng from the DAO." Defendants' objection to this statement on the grounds that it constitutes multiple layers of inadmissible hearsay is sustained. Indeed, Eng heard the statement from another DDA III, who heard it from another colleague still. Moreover, the Plaintiff does not cite, nor can the Court discern, any hearsay exception under which the statements fall. The Court is unpersuaded, in any event, that this statement is necessary for Plaintiff's Claim against Cooley to survive summary judgment.

investigations undertaken by his subordinates against Eng such that his acquiescence in their continuation would absolve him of section 1983 liability.

### 2. *Sowders' and Livesay's Retaliatory Motive*

Defendants also contend that summary adjudication of all of the claims against Sowders and Livesay is required because Plaintiff failed to produce any evidence that they harbored any retaliatory motive when they acted. (Cooley, et al. MSJ at 9.) Specifically, Defendants contend that Eng's protected speech was unknown to Sowders and Livesay when they acted, and that all the actions they took against Eng were complete or contemplated by the time they learned of his comments. (Id.) Plaintiff counters, and the Court agrees, that neither argument suffices to relieve Sowders and Livesay of section 1983 liability at this time.

Defendants rely on *Clark County School District v. Bredeen*, 532 U.S. 268 (2001) to argue that Sowders' and Livesay's lack of knowledge of Plaintiff's protected speech defeats his claim that any subsequent acts were taken in retaliation for that speech. In *Bredeen*, the Court held that the plaintiff could not rely on the issuance of an Equal Employment Opportunity Commission ("EEOC") Right to Sue letter as the basis for an alleged retaliatory transfer because there was no indication that the defendant knew of the letter, or the underlying claim, before proposing the transfer. *Clark County School District v. Bredeen*, 532 U.S. at 273. *See also Morgan v. Regents of Univ. of Cal.*, 88 Cal.App.4th at 69-70 (2000) (citation and quotations omitted) (noting that "retaliatory motive is proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter"). Logical though this rule may be, the absence of evidence of Defendants' knowledge is not so clear as was the case in *Bredeen*.

Defendants attempt to convince the Court that because neither Livesay nor Sowders was on the Task Force, neither could possibly have had any knowledge of the goings-on at Task Force meetings. (Cooley, et al. MSJ at 10.) However, Sowders, who reported to Livesay, indicated to Plaintiff that the suspensions to which Eng was subject would have come sooner but for the fact that he was performing sensitive work as a

member of the Task Force. This comment demonstrates the possibility that Sowders, at the very least, was informed of Plaintiff's allegedly controversial statements. Sowders' knowledge of Plaintiff's statements regarding the COPs therefore remains in dispute.

That all of Livesay and Sowders' actions were contemplated before Eng's covered speech is insufficient to occasion summary judgment in their favor.[24] Even a plaintiff who "could have been discharged for no reason whatever . . . may nonetheless establish a claim ... if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." *Mt. Healthy City School District v. Doyle*, 429 U.S. at 283-84. As such, a plaintiff "need [not] show that the actions taken against him were wrongful or inappropriate in themselves." *Allen v. Iranon*, 283 F.3d at 1076 (citation omitted). While it is true that an employee "ought not to be able, by engaging in [protected speech], [be able] to prevent his employer from assessing his performance record and reaching a decision . . . on the basis of that record, the burden does fall on the employer to show not simply that it *could* have, but that it *would* have reached the same decision or engaged in the same conduct even in the absence of the protected speech. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. at 285-86 (cautioning that a plaintiff should not be placed "in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing"); *Allen v. Scribner*, 812 F.2d 426, 433, 435 (9th Cir. 1987) (noting that the fact that the plaintiff's "conduct might have justified an adverse employment decision, including a transfer, does not [alone] suffice" to relieve a defendant of liability).

Consistent with *Scribner*, the fact that the suspensions were "contemplated" prior to Plaintiff's exercise of his free speech rights is not sufficient to satisfy Defendants' burden to prove that they *would* have taken the same action had Eng not so spoken. That

---

[24] Nor is Defendants' statute of limitations argument. (See Cooley, et al. MSJ at 14.) Defendant contends that all actions taken prior to October 7, 2002 are time-barred pursuant to California's former one year statute of limitations, which did not apply retroactively to claims based on discrete actions already time-barred when the two year limitations period went into effect. *See Jones v. Blanas*, 393 F.3d at 927. However, in light of the Ninth Circuit's "pitch" in favor of the application of the continuing violations doctrine to, for example, the continuing investigations in this case (*Eng. v. Cooley*, 552 F.3d at 1073 n.4), as well as Eng's Declaration regarding inquiries as to his location upon returning from his mother's funeral in September 2003, the Court finds it inappropriate to dismiss any part of Plaintiffs claims against these Defendants on this basis.

Plaintiff's conduct aside from the exercise of his free speech rights *might* have justified all of the disciplinary actions to which he was subject is irrelevant without proof that Defendants would have disciplined him in any event, especially in light of Livesay's admission that he could not recall the DAO ever disciplining another individual for some of the same conduct on which Eng's suspensions were based.  *See Coszalter v. City of Salem*, 320 F.3d at 978 (noting that "a reasonable fact finder could find from the inconsistent application of [city] policy that the defendants' motivation for enforcing the policy . . . was retaliation for [the plaintiff's] constitutionally protected speech").  Moreover, (1) the proximity in time between Eng's comments regarding the COPs and both Livesay's letter regarding administrative leave and Matsumoto's letter (bearing Livesay's name) regarding the first suspension (*see Allen v. Iranon*, 283 F.3d at 1078 (holding that an "eleven-month gap in time is within the range that has been found to support an inference [of] retaliatory [motive]")); and (2) Sowders' indication after publication of the article that the DAO would "come up with additional things to charge [Eng] with" such that he would never be allowed to return to work weigh against the inference that *none* of the disciplinary actions were based on retaliatory motives.

Sowders' and Livesay's motives, retaliatory or otherwise, must thus be submitted to a jury for decision.[25]   Accordingly, with the exception of issues pertaining to the alleged retaliatory basis for the DAO's failure to promote Eng in either 2005 or 2008, Cooley, Sowders, and Livesay's Motion for Summary Judgment is DENIED.[26]

C.   LOS ANGELES COUNTY'S MOTION FOR SUMMARY JUDGMENT

Finally, Defendants move for summary judgment of all of claims against the County on the basis that Plaintiff cannot produce sufficient evidence to satisfy the

---

[25] However, for the same reasons discussed above, Cooley, Sowders, and Livesay are all entitled to summary adjudication of Plaintiff's claims that the DAO's failures to promote him both in 2005 after the DDA IV examination and in 2008 when he applied for the Environmental Law Section position were retaliatory in nature.  As discussed in relation to Hazell, Plaintiff did not produce any evidence to show either that any action that might have been taken by any Defendant in relation to his AP score could have in any way effected the outcome of his examination, or that any Defendant had any part in the DAO's decision to offer the Environmental Law Position to another candidate.

[26] It should come as no surprise then, that based on Defendants' own reasoning, their Motion for Summary Adjudication of Plaintiff's claim for intentional infliction of emotional distress against Cooley, Sowders, and Livesay is also DENIED.

requirements for establishing municipal liability under *Monell v. Dept. Of Social Servs. of N.Y. City*, 436 U.S. 658 (1978).  (County MSJ at 1.)  As noted above, section 1983 liability attaches to "every person who, under color of [law] . . . , subjects, or *causes to be subjected*, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws."  42 U.S.C. § 1983 (emphasis added).  Included in the definition of "persons" whose unconstitutional actions may occasion section 1983 liability is municipalities, such as the County here. *Christie v. Iopa*, 176 F.3d 1231, 1243 (9th Cir. 1999) (citing *Monell v. Dept. Of Social Servs. of N.Y. City*, 436 U.S. at 694). However, with the enactment of section 1983, Congress did not intend to subject municipalities to *respondeat superior* liability for torts committed by its employees. *Id.* (citing *Monell v. Dept. Of Soc. Servs. of N.Y. City*, 436 U.S. at 691).

Accordingly, a plaintiff seeking to impose section 1983 liability on a municipality must premise his or her claim on one of three distinct theories: "(1) that a [municipal] employee was acting pursuant to an expressly adopted official policy; (2) that a [municipal] employee was acting pursuant to a longstanding practice or custom; or (3) that a [municipal] employee was acting as a 'final policymaker.'" *Lytle v. Carl*, 382 F.3d 978, 982 (2004) (quoting *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir.2003)). *See also Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 383, 406 (1997) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (noting that "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, [when the plaintiff alleges that the municipal action itself violated federal law], give rise to municipal liability").  Eng does not contend Defendants retaliated pursuant to any expressly adopted official "policy," but rather pursuant to a pattern or practice that does not require the identification of an actor with final policymaking authority.  (Opp'n to County MSJ at 16-17.)

Plaintiff is correct.  Because local governments "may be sued for constitutional deprivations visited pursuant to government 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels," a section 1983 "plaintiff [] may be able to recover from a municipality without adducing evidence

of an affirmative decision by policymakers if able to prove that the challenged action was pursuant to a [] 'custom or usage.'" *Pembaur v. City of Cincinnati*, 475 U.S. at 480 (citing *Monell v. Dept. Of Social Servs. of N.Y. City*, 436 U.S. at 690-91). *See also Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. at 404 (citations omitted) (noting that an "act performed pursuant to a 'custom' that has *not* been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law" (emphasis added)); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (assigning liability for "customs," or "permanent and well-settled practices," and not simply "express municipal 'polic[ies],'" ensures the inability of policymakers to insulate municipal governments from *Monell* liability through the simple delegation of policymaking authority). "Liability for improper custom may not [however,] be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (1996) (citations omitted). *See also Christie v. Iopa*, 176 F.3d at 1235 (rejecting the plaintiffs' attempt to impose municipal liability under a "custom" theory because they alleged that "a county official [] singled them out for unique treatment," and thus, could not possibly have been acting pursuant to "a longstanding practice or custom").

Defendants correctly point out that Plaintiff has not identified any other individual in the DAO, other than himself, that has suffered acts of retaliation for what he describes as "the lawful exercise of [] free speech rights on matters of public concern when the same were politically contrary to the [DA's] position and/or desires on matters of public concern." (Reply at 4, citing TAC ¶ 107.) However, Plaintiff does direct the Court's attention to another matter pending before this Court, *One Unnamed Deputy District Attorney v. County of Los Angeles, et al.* (CV 09-7931 ODW (SSx)), and claims that case illustrates the pattern and practice of retaliation in the DAO. (Dkt. # 221, Eng Apr. 21, 2010 Request for Judicial Notice, Exhibit A.) Specifically, Plaintiff claims that the Court's decision to grant the preliminary injunction requested by the plaintiffs in that case

demonstrates a recognition that the alleged "custom" on which Plaintiff here relies actually exists. (Opp'n to County MSJ at 16-17.) Yet, as Plaintiff himself admits, that case involves alleged retaliation for DDA's unionization, a matter of personal an professional concern, and not for speech that, as Plaintiff puts it, is "politically contrary to the [DA's] position and/or desires on matters of public concern." As such, that matter is inapposite for Plaintiff's present purposes.

Even were the Court to credit Plaintiff's argument and conclude that retaliation allegedly occurring within the DAO for *any* reason could establish the custom on which Plaintiff bases his claim, Plaintiff would still be unable to show that the acts (in both cases) occurred in the context of a "longstanding practice." Notably, the last adverse employment action alleged by Plaintiff in which any of the remaining Defendants were even arguably involved occurred in 2005, which computes out to three years before the union in *One Unnamed Deputy District Attorney* was even certified (2008), and long before the alleged "pattern" of retaliation saw its next occurrence. It would therefore seem that Plaintiff attempts to base "customary" liability on "isolated" or "sporadic" incidents of insufficient duration, frequency and consistency to constitute "a traditional method of carrying out policy." Accordingly, Plaintiff fails to produce sufficient evidence of a permanent and well-settled practice that might subject the County to section 1983 municipal liability.[27] Defendants' Motion for Summary Judgment of all of Plaintiff's remaining claims against the County is therefore, GRANTED.[28]

---

[27] In any event, the Court would be apt to find that none of the Defendants, Cooley and Hazell included, had final policymaking authority on matters of employee discipline such that municipal liability might properly be assessed. *See Lytle v. Carl*, 382 F.3d at 983-85 (relying on *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997) and *Christie v. Iopa*, 176 F.3d at 1236-37) ("determin[ing] whether an official is a final policymaker [by] consider[ing] whether the official's discretionary decisions are constrained by policies not of that official's making' and whether the official's decisions are 'subject to review by the municipality's authorized policymakers,'" and finding policymaking authority on the basis that "the 'Board' did not review discipline of individual employees . . . did not retain the authority to review such discipline . . . [and] had actively renounced its authority over employee discipline"). Here, there is no evidence that the County Board of Supervisors or the CSC, who promulgate and enforce the CSRs respectively, ever renounced their authority. To the contrary, the CSC retained their review authority, of which Plaintiff made use a number of times through the County's appellate procedures.

[28] This includes Plaintiff's claim against the County for intentional infliction of emotional distress on those same grounds as discussed in relation to Hazell.

## V.  CONCLUSION

For the foregoing reasons, Curtis Hazell's Motion for Summary Judgment as to First and Third Causes of Action is hereby GRANTED; Cooley, Sowders, and Livesay's Motion for Summary Judgment as to Remaining Claims Set Forth in the Third Amended Complaint is hereby DENIED; and  Los Angeles County's Motion for Summary Judgment as to Remaining Claims Set Forth in the Third Amended Complaint is hereby GRANTED.


IT IS SO ORDERED.


August 24, 2010

_____
HON. OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE